UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MICHAEL H. MARQUELING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:12-CV-426** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Michael Marqueling appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[2] (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be REVERSED, and the case will be REMANDED to the

Commissioner for further proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Marqueling applied for SSI and DIB in September 2008, alleging that he became

disabled as of April 3, 2008. (Tr. 152-62.)  The Commissioner denied Marqueling's application

initially and upon reconsideration, and Marqueling requested an administrative hearing. (Tr. 80-

102.)  On January 18, 2011, a hearing was conducted by Administrative Law Judge ("ALJ")

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013.  As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

John Pope, at which Marqueling, who was represented by counsel; his wife; and a vocational expert ("VE") testified. (Tr. 35-79.)  On April 26, 2011, the ALJ rendered an unfavorable decision to Marqueling, concluding that he was not disabled because he could perform a significant number of unskilled, light work jobs in the economy. (Tr. 16-34.)  The Appeals Council denied Marqueling's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4, 277-79); 20 C.F.R. §§ 404.981, 416.1481.

Marqueling filed a complaint with this Court on November 28, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Marqueling contends that the ALJ (1) assigned an residual functional capacity ("RFC") and posed a hypothetical to the VE at step five that did not adequately reflect his moderate difficulties in concentration, persistence, or pace; (2) improperly evaluated the opinion of his treating psychiatric nurse, Ms. Lothamer; and (3) improperly discounted the credibility of his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 16-25.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Marqueling was thirty-six years old (Tr. 152); had a high school education and some vocational training in desktop publishing (Tr. 41, 195); and possessed work experience as a database manager, deliverer, packager, machine operator, and typesetter (Tr. 27, 190-91, 276).  He alleges disability due to degenerative disk disease, coronary artery disease status post stent placement, and bipolar disorder. (Opening Br. 2.)  Marqueling,

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 670-page administrative record necessary to the decision.

however, does not challenge the ALJ's findings concerning his physical conditions (Opening Br. 16-25), and thus, the Court will focus on the evidence pertaining to his mental limitations.

At the hearing, Marqueling testified that he lives in a one-story home with his wife, who works outside the home, and three teenage children. (Tr. 40-41, 48.)  He drives a car, but prefers to do so with his wife in the vehicle in the event he has a panic attack. (Tr. 41, 55, 57.)  In a typical day, Marqueling gets up between 8:30 and 12:30, gets something to eat, and then lies down and watches television "pretty much all day," explaining that he is "not really that ambitious anymore" and has no back pain when lying down. (Tr. 46-47, 56, 63.)  He performs his self care independently, but his wife performs most of the household chores; he does, however, go grocery shopping with her. (Tr. 47-48, 56-57.)  For leisure, he enjoys using the computer. (Tr. 48.)

As to his mental limitations, Marqueling stated that he suffers from panic attacks up to three times a day, each ten to fifteen minutes in duration. (Tr. 49.)  His heart races and his "ears get really warm" during an attack, but he experiences no other symptoms. (Tr. 49.)  When asked what psychological conditions, aside from panic attacks, would affect his ability to work, he responded simply that he lacks "drive" and confidence. (Tr. 49-50.)  He added that although he is "pretty easy going," he has some difficulty concentrating and has suicidal thoughts every day. (Tr. 52, 61.)  He finds it stressful to spend time around others, with the exception of his wife, and thus leaves home only once or twice a week.[4] (Tr. 60-61, 63.)

---

[4] Marqueling's wife also testified at the hearing, essentially corroborating his testimony. (Tr. 28-34.)  She added that he experiences manic episodes about once a month (Tr. 65-67) and that she has to urge him to bathe and change his clothes (Tr. 68).

### B.  Summary of the Medical Evidence

In February 2008, Marqueling was evaluated by Veronica Philbin, a psychiatric nurse, at the office of Dr. Jay Fawver. (Tr. 280-83.)  He presented with depressed mood, anhedonia, hopelessness, and suicidal symptoms; he also described past manic episodes. (Tr. 280.)  He was assigned a diagnosis of bipolar I disorder, most recent episode manic. (Tr. 282.)  He saw Dr. Fawver several times in March and April, reporting in April that he had quit his job because he was feeling "fed up." (Tr. 284-96.)

In September 2008, Marqueling was evaluated by Tara Pelz, a counselor at Park Center. (Tr. 385-93.)  He was diagnosed with a mood disorder, not otherwise specified, and assigned a Global Assessment of Functioning ("GAF") score of 55.[5] (Tr. 391-92.)  The assessment was certified by Vivian Hernandez, Ph.D., who noted that bipolar disorder needed to be ruled out. (Tr. 393.)

In December 2008, Marqueling was evaluated by Karen Lothamer, a psychiatric nurse at Park Center. (Tr. 398-401.)  She documented that he exhibited appropriate behavior and normal insight, judgment, and thinking form and content, but had some memory problems. (Tr. 399.)  His mood and affect were both depressed and elated, but he had no suicidal or homicidal thoughts. (Tr. 399.)  He reported that his thoughts were of depression, low energy, and no motivation; or lots of energy and wanting to try various tasks. (Tr. 400.)  Her diagnostic

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., TEXT REV. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

4

impression was bipolar I disorder, most recent episode mixed, moderate; she assigned him a GAF of 55. (Tr. 402.) The evaluation was approved by Dr. Larry Lambertson. (Tr. 402.)

The following month, January 2009, Marqueling told Ms. Lothamer that he had run out of some of his medications a week earlier and could not afford to buy more. (Tr. 404.) He had become angry and hit a door when he was taking Abilify, but improved after he stopped using it. (Tr. 404.) His mood was depressed and irritable, and his thought content depressed and blaming; he had a detached attitude, withdrawn behavior, and flat affect. (Tr. 404-05.) Ms. Lothamer assessed that overall he was slightly better. (Tr. 406.) Dr. Vijoy Varma approved her report. (Tr. 408.) Later that month, Marqueling reported that his medications were working well for mood stabilization, but he was having trouble sleeping. (Tr. 529.)

In February 2009, Marqueling's sister told Ms. Lothamer that he was more depressed, experiencing mood changes, and was not motivated. (Tr. 524.) Ms. Lothamer documented that Marqueling's mood was depressed and fluctuating and his thought content depressive. (Tr. 524.) On mental status exam, Marqueling demonstrated a detached attitude, distractible behavior, and flat and incongruent affect. (Tr. 525-26.) Ms. Lothamer assessed him as symptomatic, but stable, and adjusted his medications. (Tr. 526.)

Marqueling saw Ms. Lothamer the following month, reporting that he had experienced a panic attack that lasted for two hours after smoking cannabis. (Tr. 413.) He continued to have some issues with depression, but was slightly improved with medications. (Tr. 413.) On mental status exam, he again had distractible behavior and a flat affect. (Tr. 415.) The next month, Marqueling's wife reported to Park Center that he was not sleeping and was entering a manic phase. (Tr. 419.) In May, however, Marqueling requested a referral to return to work even

5

though he still had some issues with depression. (Tr. 471.)  On mental status exam, he had an evasive and guarded attitude, distractible behavior, and incongruent affect. (Tr. 471.)  Ms. Lothamer concluded that he was symptomatic, but stable, and adjusted his medications. (Tr. 473.)

Also in May 2009, Sherwin Kepes, Ph.D., evaluated Marqueling at the request of Social Security. (Tr. 422-25.)  Dr. Kepes observed that Marqueling had some difficulty remembering times and dates and that he demonstrated a flat affect and almost vacant stare; Marqueling reported that he felt "worthless" and that he had suicidal ideation on a daily basis. (Tr. 423.)  On mental status exam, Marqueling could recall five digits forward and four backward; his memory for recent events was adequate. (Tr. 423.)  He responded to serial sevens correctly reaching fifty-one after ninety seconds but then stopped, indicating that he was having difficulty concentrating. (Tr. 423.)  The mental status exam did not reveal any significant problems with his general level of intellectual functioning. (Tr. 423-24.)  Dr. Kepes concluded that Marqueling appeared to be evidencing signs of depression in the form of anhedonia, a lack of goal-directed activities, helplessness, low self-esteem, and constant suicidal ideation. (Tr. 425.)  He assigned Marqueling a diagnosis of bipolar disorder II and a GAF of 50. (Tr. 425.)

In June 2009, F. Kladder, Ph.D., a state agency psychologist, reviewed Marqueling's record and completed a psychiatric review technique and mental RFC assessment. (Tr. 430-43.)  On the psychiatric review technique, Dr. Kladder concluded that Marqueling had no limitations in performing his daily living activities; "mild" limitations in maintaining social functioning; and "moderate" limitations in maintaining concentration, persistence, or pace. (Tr. 440.)  On the mental RFC form, Dr. Kladder wrote that Marqueling was "not significantly limited" in fifteen

6

of twenty mental work-related abilities, but that he was "moderately limited" in the following abilities: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 426-27.)  In his narrative section, Dr. Kladder wrote that the medical records did not support the severity of the limitations expressed and that Marqueling had the mental RFC to perform "work like activities." (Tr. 428.)  Dr. Kladder's opinion was later affirmed by a second state agency psychologist, Donna Unversaw, Ph.D. (Tr. 497.)

In July 2009, Ms. Lothamer wrote that Marqueling's mood was depressed; on mental status exam, he displayed an elusive and guarded attitude, slow behavior, and flat affect. (Tr. 478.)  She wrote again that he was symptomatic, but stable, and adjusted his medications. (Tr. 479.)  The next month, Marqueling's wife reported that he was doing better with Zoloft, but that he still had periods of depression. (Tr. 464.)  A week later, however, Marqueling's wife said that he was having increased suicidal thoughts at night, and Ms. Lothamer increased his Zoloft. (Tr. 491.)

In August, Marqueling began the vocational rehab process at Park Center, mistakenly thinking that it would find him a job. (Tr. 519.)  After some thought, he decided to continue the program regardless. (Tr. 518-19.)  In October, he became upset with his employment counselor after being asked to do more than he was comfortable with. (Tr. 516.)  Later that month, he drove to put in an application, but then changed his mind and returned home; the counselor thought that Marqueling was struggling with motivation. (Tr. 513.)  He missed his next vocational session because he "slept in." (Tr. 512.)  Marqueling appeared for his next

appointment, but had not completed his weekly behavior plan. (Tr. 511.)

In November 2009, Marqueling told Ms. Lothamer that his medications were working, but that he still had suicidal thoughts. (Tr. 481.)  He had a depressed mood, distractible behavior, and incoherent thought form. (Tr. 481.)  Again Ms. Lothamer wrote that he was symptomatic, but stable; she adjusted his medications. (Tr. 484.)  She suggested that he attend the Carriage House mental health program. (Tr. 481.)

In January 2010, Marqueling reported to his vocational counselor that he had not applied for any position since early November; he could not articulate why had failed to do so. (Tr. 507.) In February, Marqueling told his vocational counselor that he was interested in attending the Carriage House program. (Tr. 505.)  But that same day, Marqueling told Ms. Lothamer that he had no energy to do things around the house or go to school or work. (Tr. 500.)  He evidenced a distractible behavior and flat affect; Ms. Lothamer wrote that he was stable "[m]aintaining well and stable." (Tr. 503.)  She continued his medications. (Tr. 503.)

Marqueling's wife called Ms. Lothamer in March 2010, reporting that he had been having panic attacks and difficulty sleeping for the past few days. (Tr. 630.)  She further relayed that his mind was racing and that he felt worried and was "not acting like himself." (Tr. 630.) She noted that he had an upcoming court date. (Tr. 630.)  In May, Marqueling told Ms. Lothamer that he was feeling depressed, irritable, and unmotivated over the last two weeks, but was starting to come out of it. (Tr. 625.)  She concluded that his symptoms were slightly worse. (Tr. 628.)

In June 2010, Ms. Lothamer completed a mental RFC questionnaire on Marqueling's behalf. (Tr. 533-37.)  Her clinical findings included flat affect; depressed mood; fair eye contact;

8

slow, but coherent speech; depressed thoughts; low self esteem; low energy or lots of energy; and starting tasks, but not completing them. (Tr. 533.) She assigned him a fair prognosis. (Tr. 533.) She checked the boxes for the following signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; poverty of content and speech; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; hyperactivity; easy distractability; and sleep disturbance. (Tr. 534.) Ms. Lothamer checked the boxes for "seriously limited, but not precluded" with respect to Marqueling's ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; and ask simple questions or request assistance. (Tr. 535.)

In addition, Ms. Lothamer checked the box for "unable to meet competitive standards"—defined on the form as unable to "satisfactorily perform th[e] activity independently, appropriately, effectively, and on a sustained basis in a regular work setting"—in the following mental abilities:

> maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usual strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; understand, remember, and carry out detailed

> instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places and use public transportation.

(Tr. 535-36.) Ms. Lothamer explained these limitations by listing Marqueling's lack of focus; decreased concentration; low energy; lethargy; depression; sleep problems; isolation; and drowsiness, which was a side effect of his medications. (Tr. 535-36.)  She estimated that he would miss more than four days of work per month due to his mental condition. (Tr. 537.)

In July 2010, Marqueling saw Ms. Lothamer, stating that he was having problems with anxiety. (Tr. 613.)  He reported that he felt shaky and had an increased heart rate and rapid breathing. (Tr. 613.)  He had a depressed mood, blaming thought content, and suicidal ideation. (Tr. 614.)  Ms. Lothamer increased his lithium. (Tr. 613.)

On August 3, 2010, Marqueling was assessed at Parkview Behavioral Health due to increased agitation, aggression, and mania. (Tr. 612.)  He was upset with his wife and was throwing things at home; he had suicidal thoughts with a plan. (Tr. 612.)  He was sent home with his sister for the night; the next day, his wife reported that he had been manic for the past twenty-four hours and that he could not return home until he was stabilized. (Tr. 607.)  Park Center determined that he was at imminent risk of harm to himself and others, and he was hospitalized. (Tr. 604.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

11

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On April 26, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 19-29.)  He found at step one of the five-step analysis that Marqueling had not engaged in substantial gainful activity since his alleged onset date; and at step two, that his degenerative disk disease, coronary artery disease status post stent placement, and bipolar disorder were severe impairments. (Tr. 21.)  At step three, the ALJ determined that Marqueling's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 21-23.)

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Before proceeding to step four, the ALJ determined that Marqueling's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except should only occasionally climb ladders, ropes, or scaffolds; should only frequently climb ram[p]s and stairs, balance, stoop, kneel, crouch, and crawl; and is limited to unskilled work.

(Tr. 23.)  Based on this RFC and the VE's testimony, the ALJ concluded at step four that Marqueling was able to perform his past relevant work as a packager. (Tr. 27.)  In addition, the ALJ concluded at step five that Marqueling could perform a significant number of other unskilled, light jobs within the economy, including office helper, parking lot attendant, and electronics worker. (Tr. 27-28.)  Accordingly, Marqueling's claims for DIB and SSI were denied. (Tr. 28-29.)

### C. The ALJ Failed to Build an Accurate and Logical Bridge from Marqueling's Moderate Deficits in Maintaining Concentration, Persistence, or Pace to an RFC for Unskilled Work

Marqueling first contends that the ALJ failed to adequately account in the mental RFC and step five hypothetical for his finding at step two that Marqueling had moderate deficiencies in maintaining concentration, persistence, or pace.  Indeed, the RFC and the hypothetical do not withstand scrutiny in this regard.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing his degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4.  Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas":  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3),

13

416.920a(c)(3); *see Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

 "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." SSR 96-8p, 1996 WL 374184, at *4; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011).  To reiterate, the "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  In that regard, cases from the Seventh Circuit Court of Appeals "generally have required the ALJ to orient the VE to the totality of a claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  The "cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.*

 Here, when assessing the "paragraph B" criteria at step three, the ALJ concluded that Marqueling had "moderate" restrictions in maintaining concentration, persistence, or pace, as well as "mild" restrictions in social functioning. (Tr. 22-23.)  But rather than include these "moderate" restrictions of concentration, persistence, or pace directly in the hypothetical to the VE as the Seventh Circuit suggests, the ALJ instead assigned Marqueling a mental RFC for "unskilled work." (Tr. 23.)

 The Seventh Circuit has clarified, however, that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that

14

opinion in formulating a hypothetical question for the VE. *See Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work").  Here, Dr. Kladder, the state agency psychologist, after finding that Marqueling had "moderate" deficits in concentration, persistence, or pace, opined in his narrative that Marqueling had the mental RFC for "work like activities." (Tr. 428.)  Therefore, it is possible that the ALJ may have relied upon Dr. Kladder's opinion when crafting the RFC for "unskilled work," but it is unclear what a medical source statement for "work like activities" actually means.[7]

And there is another problem with the ALJ's consideration of Dr. Kladder's opinion. Although the ALJ at step three correctly considered that Dr. Kladder had assigned Marqueling moderate deficits in concentration, persistence, or pace (Tr. 23), the ALJ seemingly overlooked this same restriction when crafting the RFC (Tr. 26).  To explain, when discussing the RFC, the ALJ cited the state agency doctor's opinions, including Dr. Kladder's, and stated: "As for the opinion evidence, the above-assessed [RFC] is more generous to the claimant than that of the State Agency, which found *no mental restrictions* and opined he could perform at the Medium

---

[7] The Commissioner misstates the record in this respect, reciting that the state agency psychologists "opined that, despite [Marqueling's] moderate concentration and persistence deficits, he could perform *basic* work-like activities." (Def.'s Mem. in Supp. of the Commissioner's Decision 7 (emphasis added).)  But Dr. Kladder did not opine that Marqueling could perform "basic work-like activities," which would be more akin to unskilled work. Rather, Dr. Kladder merely articulated that Marqueling could perform "work like activities," which increases the ambiguity of his purported translation. (Tr. 428.)

exertional level." (Tr. 26) (emphasis added) (citations omitted).  The ALJ went on to articulate: "However, given their individual consistency, the undersigned still affords these opinions a good deal of weight in the formulation of the present decision." (Tr. 26.)  Thus, the ALJ ultimately assigned "a good deal of weight" to what appears to be an inaccurate perception of Dr. Kladder's opinion.

Furthermore, although Dr. Kladder opined that Marqueling had "mild" limitations in social functioning on the psychiatric review technique form, he specifically indicated on the mental RFC assessment that Marqueling was "moderately limited" in his "ability to accept instructions and respond appropriately to criticism from supervisors." (Tr. 427.)  The Social Security Administration has instructed that this particular mental activity is generally required to perform unskilled work, SSR 96-9p, 1996 WL 374186, at *9, which undercuts the RFC assigned by the ALJ. *Cf. Karger v. Astrue*, 566 F. Supp. 2d 897, 909 (W.D. Wis. 2008) (affirming ALJ's decision where the record indicated that the claimant had all the prerequisite mental abilities necessary to perform "unskilled" work).  "As the Commissioner has explained before, even a moderate limitation on responding appropriately to supervisors may undermine seriously a claimant's ability to work." *O'Connor-Spinner*, 627 F.3d at 621 (citing 20 C.F.R. § 404.1545(c); SSR 85-15, 1985 WL 56857); *see* 20 C.F.R. §§ 404.1545(c), 416.945(c) ("A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and *in responding appropriately to supervision*, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." (emphasis added)).

In sum, the ALJ failed to build an accurate and logical bridge between Marqueling's

16

moderate deficits in maintaining concentration, persistence, or pace to the assigned mental RFC for "unskilled work." *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) ("In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion.").

Accordingly, the case will be remanded to the Commissioner to reexamine the mental RFC.[8]

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and the case is REMANDED for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Marqueling and against the Commissioner.

SO ORDERED.

Enter for this 6th day of December, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[8] Because a remand is warranted with respect to Marqueling's mental RFC, the Court need not reach his two remaining arguments—that the ALJ improperly discounted both Ms. Lothamer's opinion and the credibility of Marqueling's symptom testimony.

The Court notes, however, that at least one of the ALJ's reasons for discounting Ms. Lothamer's opinion–that she "primarily relied upon the claimant's subjective reports rather than the objective evidence" (Tr. 26)–is not particularly well-grounded, as Ms. Lothamer frequently cited clinical findings in her progress notes. (*See, e.g.*, Tr. 399, 404-06, 413-15, 472-73, 481-83, 502, 524, 526, 614, 624-25, 627); *see generally Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 797 (E.D. Wis. 2004) ("[D]octors are allowed to rely on their patients' descriptions of their conditions.  How else is a psychologist to evaluate a patient's mental illness, other than talking to him?  Depression does not show on an x-ray.").  Having said that, Ms. Lothamer's opinion *is* notably inconsistent with other substantial evidence of record, offering some traction to the ALJ's theory of bias. *See generally Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("[T]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  In any event, the ALJ is encouraged upon remand to revisit, at least to some extent, his rationale for discounting Ms. Lothamer's opinion.

17